UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES OF AMERICA

-against-

MICHAEL BROWN and
TYQUAN MIDYETT,

          Defendants.

----------------------------------X

**MEMORANDUM & ORDER**

07-CR-874 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

## I.  BACKGROUND

Defendants Michael Brown and Tyquan Midyett move to suppress property and contraband recovered during a search by the New York Police Department (NYPD) of Brown's apartment and its occupants in the Marcy Housing Project, at 125 Nostrand Avenue, Apartment 2A, in Brooklyn, New York (Apartment 2A), on January 9, 2007, and Brown's post-arrest statements. Defendants are charged in a seventeen-count indictment with conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), possessing with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), and possessing with intent to distribute cocaine base in a school zone and in public housing in violation of 21 U.S.C. § 860. Defendant Brown is also charged with using and carrying a

1

firearm in relation to a drug trafficking offense in violation
of 18 U.S.C. § 924(c).  Midyett is also charged with being a
convicted felon in possession of a firearm in violation of 18
U.S.C. § 922(g)(1).

## 1.    The Motions to Suppress

### A.    Brown's Motion to Suppress

Brown filed a motion dated August 6, 2008 (Doc. 124)
to suppress the following physical evidence recovered during a
search of Apartment 2A: (1) .22 caliber revolver and ammunition,
(2) 27 vials of crack cocaine seized from a shelf in a closet in
or near the kitchen, (3) two cellular telephones, and
(4) $122.35 in cash, and statements that Brown made after his
arrest.  Brown "does not contend that his [post arrest]
statement at the precinct was involuntarily made but . . .
contend[s] that it should be suppressed as the fruit of an
illegal arrest and search."  (Doc. 124, Attach. 1, Brown Mem. at
3.)

Brown's affidavit (Doc. 124, Attach. 2, Brown Aff.) in
support of his motion states that on January 9, 2007, he was
residing at Apartment 2A (Id. ¶ 2), that at approximately 1:00
p.m. an officer knocked on the door of Apartment 2A, pointed

what appeared to be an assault rifle, yelled, "everybody down," struck an individual named Daquan Cassidy with the rifle, and with "several police officers in the hallway behind the officer with the rifle," pulled individuals out of the apartment into the hallway where they were handcuffed. According to Brown's affidavit, officers then entered Apartment 2A and began searching the apartment, and announced that "everything is clean, we didn't find anything." (Id. ¶¶ 3-8.) Brown's affidavit also states that another officer was sent into Apartment 2A and, subsequently, officers reported that they found a gun and other contraband. Brown denies that he or anyone in the apartment consented to the search of Apartment 2A. (Id. ¶¶ 9-11.)

In his initial submission, Brown contended that the physical evidence seized from his apartment and its occupants must be suppressed as a product of a warrantless search of his home. Brown further contended that although officers claimed to have seen an individual throw a plastic bag containing vials of crack out of the window of Apartment 2A, exigent circumstances did not exist and thus did not justify the warrantless search. Brown also asserted that the police did not obtain the consent

of the tenant of Apartment 2A for the search.  (Brown Mem. at 4.)

Following the government's August 29, 2008 submissions in opposition to Brown's motion, in which the government asserted that a valid search warrant for Apartment 2A and exigent circumstances authorized the search of Brown's apartment, the defendants were invited to make additional submissions.  Brown contended in subsequent submissions (doc. nos. 155, 158, 229), that the search of Apartment 2A was not pursuant to a warrant because the officer directing the search did not know about the warrant or sufficient details about the warrant, did not have the warrant in hand at the time of the search, did not communicate the existence of the warrant to the officers conducting the search and that exigent circumstances did not exist.

### B.  Midyett's Motion to Suppress

In a letter dated August 10, 2008 (Doc. 126), defendant Midyett joined "in all respects" Brown's motion to suppress "all items recovered form [sic] the scene and locus of the arrest," and "all items seized from the person of Mr. Midyett."  Midyett subsequently submitted an affidavit dated

September 10, 2008 (Doc. 147, Midyett Aff.), in which he stated that he was in Apartment 2A on January 9, 2007 "visiting a legal resident of the premises," was not engaged in illegal activity and did not observe any of the occupants of the premises engaged in any illegal activity.  (Id. ¶¶ 1-3.)  Midyett's affidavit further states that "without cause, reason or permission," law enforcement officials entered Apartment 2A and conducted an extensive search of the premises and the persons located within, and that during the search of his person, United States currency and "other personal property" were taken from him.  (Id. ¶ 5.)  Midyett requested that the court conduct a pretrial evidentiary hearing "to assess and review the legality of the search of the said premises and that of my person."  (Id. ¶ 6.)

By letter dated October 12, 2008 (Doc. 156), Midyett provided legal authority in support of his assertion that he had a protected privacy interest as an invited guest to Brown's residence in Apartment 2A and, thus, had standing to challenge the search and seizures.  Thereafter, on November 20, 2008, Midyett's new counsel, John Burke, Esq., submitted an additional affirmation and memorandum of law (Doc. 176, Burke Aff. and Midyett Mem.) in support of Midyett's motion to suppress the evidence seized in Apartment 2A, and specifically asserted that

Midyett had standing to request a suppression hearing regarding $1,700 seized by the police "from a place where [Midyett] has a reasonable expectation of privacy, his pants pocket."  Midyett also asserted that the affidavit in support of the search warrant and the search warrant for Apartment 2A indicate that only one person, not Tyquan Midyett, should be searched. (Midyett Mem. at 2.)

### C.    Government Opposition to Defendants' Motions

In a memorandum of law dated August 29, 2008 (doc. 139, Gov. Mem.), the government opposed the defendants' motion, asserting that at the time of the search on January 9, 2007, there was a valid search warrant for Apartment 2A, signed on January 3, 2007, authorizing, within ten days of the date of issuance, "any police officer in the city of New York" to search Brown and his apartment for drugs, drug paraphernalia and other related evidence during the hours of 6:00 a.m. and 9:00 p.m. The government asserted that the search conducted by the NYPD complied with and was authorized by the warrant.  (Gov. Mem. at 6-9.)

The government alternatively asserted that the search of Apartment 2A was justified by exigent circumstances which

arose when the NYPD observed an individual throw a plastic bag containing vials of crack cocaine from a window of Apartment 2A, while a search warrant was being executed for Apartment 3B, on January 9, 2007. Upon entering Apartment 2A, according to the government, officers of the NYPD Emergency Services Unit (ESU) conducting a security sweep observed in plain view the hand gun and vials of crack cocaine that matched the vials that the NYPD observed being thrown from the window of Apartment 2A. (Id. at 10-17.)

The government opposed Brown's motion to suppress his "spontaneous" post arrest statements at the police station and his Mirandized statements, asserting that because the search was lawful, the statements cannot be suppressed as fruit of the poisonous tree. (Id. at 18; Exhibit D thereto, Miranda Warnings signed by Brown and handwritten statement signed by Brown.) The government also contested Midyett's standing to challenge the legality of the search of Brown's apartment because he failed to demonstrate any legally cognizable privacy interest in the place searched or items seized. (Id. at 19-21.)

## 2. **The Hearing**

The court conducted a suppression hearing on January 7, 2009. The government presented testimony from NYPD Detective Karyn Lang, who works in the Special Projects Unit of the Narcotics Division, which writes search warrants and keeps copies of special narcotics court search warrants; NYPD Captain Brian McGinn, who directed the searches on January 9, 2007 by the Housing Bureau Public Service Area 3 (PSA-3), which covers all housing developments in Brooklyn North; NYPD Detectives Rene Samaniego and Giovanni Wilson, who were assigned to the Anti-Crime Unit in PSA-3 and participated in the search of Apartment 2A on January 9, 2007. Defendant Brown presented testimony by Everett Grant, a private investigator for Jay Salpeter Associates, who was retained to take photographs of the exterior of the building at 125 Nostrand Avenue.

### A. **Detective Lang**

Detective Lang testified that the Special Projects Unit drafts search warrants for review by a bureau chief or deputy bureau chief, which are then presented by an investigator to the Special Narcotics Court to be reviewed and signed. After the search warrant is signed, the original warrant and

supporting affidavit are kept in a locked file cabinet in the
Special Projects Unit and a copy of the warrant is given to the
investigating officer who signed the warrant application.  (Tr.
3-4, 7-12)[1]

Detective Lang testified that prior to testifying at
the suppression hearing, she reviewed the original search
warrant 0014-2007 for Apartment 2A of 125 Nostrand Avenue,
Brooklyn, New York (Gov. Ex. 1), signed by Judge Anthony Ferrara
on January 3, 2007, and the supporting affidavit (Gov. Ex. 2,
Tr. 5-8).  The warrant authorizes "Any Police Officer in the
City Of New York" to search Apartment 2A and an individual known
as JD Littleman for "evidence of the possession of narcotics and
the means of committing a narcotics crime," including but not
limited to:

> a. crack/cocaine, vials, caps, glassine envelopes,
> small ziplock-style bags, and other evidence of the
> possession and distribution of crack/cocaine,
> including but not limited to paraphernalia used to
> process and distribute drugs, including but not
> limited to dilutants and scales, counter-
> surveillance equipment, and records and documents
> reflecting drug transactions.
> b. Currency and other evidence of proceeds from drug
> trafficking, including but not limited to financial
> records in any format, tending to demonstrate cash
> transactions or financial transfers derived from the
> possession of cash currency, money orders, bank

---

[1]     The transcript of the suppression hearing and arguments regarding
the January 9, 2007 search of Apartment 2A is referred to as "Tr."

receipts, stocks, bonds, bills and receipts for
goods and services, documents relating to real
estate holdings, and any title or registration to
motor vehicles;

c. evidence of ownership and use of the target
premises, or the use of property located therein by
any person, including but not limited to keys,
telephone bills, utility bills, bank statements,
leases, deeds, or rent receipts related to the
target premises, identification bearing the name or
photograph of any person, telephone books, address
books, date books, calendars, personal papers, and
videotapes and photographs of persons.

The warrant further provides that it may be executed
"without prior notice of authority or purpose," during the hours
of 6:00 a.m. and 9:00 p.m., and that it must be executed within
ten days of January 3, 2007.  (Gov. Ex. 1 at 1-2.)


### B.  Captain McGinn

Captain McGinn testified credibly as follows.  Captain
McGinn has been an officer with the NYPD for twenty-one years
and has been assigned to the Housing Bureau, PSA-3 for two and a
half years.  Prior to his assignment as a captain at PSA-3,
Captain McGinn was assigned as a captain in PSA-1, a lieutenant
in Brooklyn South narcotics, a lieutenant in the 70th and 67th
precincts and a sergeant in Brooklyn South narcotics.  (Tr. 13.)

On January 9, 2007, Captain McGinn was supervising a
warrant execution for Apartment 3B, at 125 Nostrand Avenue, the

same building as Brown's apartment, Apartment 2A. Captain
McGinn had learned of the search warrant for Apartment 2A for
crack cocaine a few days prior to January 9, 2007, from his
frequent, at least weekly, discussions with members of the
narcotics division. Captain McGinn had frequent discussions
with the narcotics division and Captain Mike Ameri because
Captain McGinn was in charge of and had to be informed of all
narcotics division search warrants and crimes in all housing
developments in the area. Captain McGinn did not know when the
search warrant for Apartment 2A was issued or who told him about
the warrant, and did not recall being told that the warrant
authorized the search of a person; he did not see the warrant.
Captain McGinn knew that the search warrant for Apartment 2A was
for crack cocaine but did not recall other particulars of the
warrant. He informed the narcotics officer that his division
was executing a search warrant for Apartment 3B on January 9,
2007. The narcotics division officer informed Captain McGinn
that the unit intended to execute the warrant for Apartment 2A
at a later date. (Tr. 13-15, 25-26, 28, 49-50, 53). Captain
McGinn did not report to his supervisor or a narcotics division
supervisor that someone from the narcotics division declined to

coordinate or cooperate with him in the execution of a search
warrant.  (Tr. 26).

On the morning of January 9, 2007, Captain McGinn's
unit had a tactical ("TAC") meeting to discuss the procedures
and tactical aspects of the execution of the search warrant for
Apartment 3B, safety procedures, each officer's location and
role, and coordination with ESU.  ESU is like a Special Weapons
and Tactics (SWAT) team that is responsible for executing search
warrants by taking down the door, tactically entering the place
to be searched and securing it, and handcuffing the occupants so
that Captain McGinn's unit can enter and conduct the actual
search.  A written TAC plan listing each officer's assigned
responsibilities was approved by Captain McGinn and discussed at
the TAC meeting.  (Tr. 16-17, 30).  According to Captain McGinn,
in addition to the responsibilities on the TAC plan, each
officer is required to watch the building in which the warrant
is being executed to ensure that wherever they are standing,
people at the location are safe and secure, because weapons and
perpetrators could exit the building from windows, as has
happened "numerous times in the past."  (Tr. 16-17).

After the TAC meeting, Captain McGinn and
approximately ten PSA-3 officers proceeded in a convoy of

approximately five vehicles and, along with approximately seven ESU officers, arrived at approximately 1:00 p.m. at 125 Nostrand Avenue. Someone on Captain McGinn's team had the search warrant for Apartment 3B. Captain McGinn had seen the search warrant for Apartment 3B but had not read the entire warrant. The PSA-3 officers secured the area outside the building while ESU executed the search warrant. The ESU team was wearing helmets and customarily carries shields and rams for the door, although Captain McGinn does not recall if ESU carried rams that day.[2] Captain McGinn stationed himself in a parking lot outside of the line of "A" apartments designated on a map showing the layout of Apartments A-D at 125 Nostrand Avenue (Government's Exhibit 4), where Captain McGinn could get the best view of his officers outside the building while ESU entered the building. (Tr. 17-19, 41-43, 46, 58-59.) From his location, Captain McGinn could see the windows of Apartment 3B that faced west toward the parking lot, but he could not see the north or east facing windows of Apartment 3B. (Tr. 32-33). Captain McGinn stationed officers all around the 125 Nostrand Avenue building except on

_____

[2] Captain McGinn testified that ESU wears shields in case there is an exchange of gunfire when they make a forcible entry or inside an apartment, and use rams or hydraulic tools to open the front door if they do not obtain consent. He further explained that ESU carries special weapons other than standard issue because "they are a lot more frequently to be engaged in firearms battles" when entering premises forcibly to execute a search warrant. (Tr. 56-57.)

the far east side of the building.  He could see most of his
officers on the north, west and south sides of the building, but
he could not see the officers stationed near the entrance on the
north side of the building, although he could hear them.  (Tr.
33-34).

Captain McGinn heard ESU enter Apartment 3B, a
"loud commotion," with "officers screaming 'search warrant.'"
He next heard one of his officers screaming that a gun was being
pointed out of one of the windows of Apartment 3B, and Captain
McGinn screamed at his officers to take cover as he drew his
weapon, moved around to the front of the building, entered the
building and ran up the stairs to the third floor.  Upon Captain
McGinn's arrival at Apartment 3B, ESU had completed their entry
into and secured Apartment 3B, with one person in handcuffs, and
the officers in PSA-3 were then able to enter and conduct a
search.  (Tr. 20-21, 44.)

Within a minute or two after Captain McGinn entered
the building in response to the report of a gun being pointed
out of a window of Apartment 3B, he was informed "that crack
cocaine came out of the window of Apartment 2A."  Captain
McGinn, members of ESU and a law enforcement agent went down to
the second floor.  Captain McGinn knew that the narcotics

division had obtained a search warrant for Apartment 2A so "it was up to [him] if we were going to gain entry." He told ESU that there was a search warrant for Apartment 2A, but directed "ESU to knock on the door, if we get consent to go in, we'll go, if we don't, we'll wait for the search warrant in hand and do it tactically, the way it's supposed to be done." (Tr. 21-23, 44, 55.)

Captain McGinn testified that they did not wait for the search warrant because a member of ESU knocked on the door, spoke to somebody at the front door who let them in, and that "it was not a forcible entry, they let us in, ESU went in and secured the apartment and then we went in." (Tr. 22.) Captain McGinn testified that it was not necessary to have the search warrant in hand, based on eight years of supervisory experience in the narcotics division and his involvement in executing hundreds of search warrants, some of which were executed without the search warrant in hand, but thought it was better and safer to obtain consent to enter the premises to be searched. The reasons for Captain McGinn's decision to search Apartment 2A without the warrant in hand were twofold: he knew that a search warrant existed for Apartment 2A and he knew that drugs had come out of a window of Apartment 2A. (Tr. 23.)

Captain McGinn observed ESU knock on the door of Apartment 2A, the door open, a discussion between ESU and the person who opened the door, and then observed ESU enter the apartment, but he does not know if consent to enter was given. Captain McGinn does not know if the ESU team had their weapons drawn when ESU knocked on the door. Captain McGinn observed ESU walk into Apartment 2A but did not observe or hear what ESU did or said inside. (Tr. 38-39, 46-47.) He entered Apartment 2A after ESU arrested seven people in the apartment for the crack cocaine that came out of the window, and drugs and a firearm that were inside the apartment.[3] ESU did not communicate with Captain McGinn as they were arresting individuals and bringing them out of the apartment. After Apartment 2A was secured by ESU and the occupants were placed in handcuffs in the hallway and entry of the apartment, Captain McGinn directed his sergeant to have his officers conduct a thorough search of the apartment. Captain McGinn was not exactly sure when or where he learned of the firearm and additional drugs found in Apartment 2A, but thought it was after he authorized the full search of the

---

[3]    On cross examination, Captain McGinn testified that ESU arrested the occupants of Apartment 2A immediately after entering Apartment 2A, and that he ordered the arrest of the occupants based on information he received that drugs had been throw out of the window of the apartment, but it is not clear from Captain McGinn's testimony on cross examination whether the drugs and gun found in Apartment 2A also factored into Captain McGinn's decision to order the arrest of the occupants. (Tr. 37, 40.)

apartment. Captain McGinn did not know where the firearm and drugs were found in Apartment 2A. Captain McGinn thought that Apartment 2A had two bedrooms, but was "not 100 percent sure," and thought that the kitchen was toward the front of the apartment. He did not observe the search of Apartment 2A because he left a minute or two after he directed his officers to search the apartment. (Tr. 24, 35-36, 38, 40-41, 48-49, 54.)

Captain McGinn did not know and had never seen Tyquan Midyett before the search on January 9, 2007. He authorized the arrest of the individuals in the apartment. (Tr. 51).

### C. Detective Samaniego

Detective Rene Samaniego testified that he has been employed by the NYPD for approximately eight years and, at the time of the search of Apartment 2A on January 9, 2007, he had been assigned to PSA-3 for approximately six years (Tr. 61-62). He attended a TAC meeting with PSA-3 on the morning of January 9, 2007, to discuss the execution of a search warrant for Apartment 3B at 125 Nostrand Avenue. While ESU conducted the entry and security sweep of Apartment 3B, Detective Samaniego and his team were assigned to the outside security of the 125

Nostrand Avenue building to ensure that evidence and
perpetrators did not exit from the windows.  (Tr. 62-63).

      Detective Samaniego was assigned to the outside area
around Apartment 2A (which he described as a location above the
"d" of the word "Nostrand" on Government's Exhibit 4, a floor
plan of the building which he had seen at the TAC meeting
earlier on the morning of January 9, 2007), inside a fenced area
and below the south facing windows of Apartment 2A, as depicted
in Government Ex. 8. (Tr. 64-67).  From where he was assigned
outside of the "A" windows of the 125 Nostrand Avenue building,
Detective Samaniego believed that "all the windows [on the third
floor] were Apartment 3B because our supervising officer told us
to watch the windows and told me to stand there."  Thus, despite
the fact that he looked at the floor plan of 125 Nostrand Avenue
earlier that morning, Detective Samaniego mistakenly thought
that he was looking at the windows of Apartment 3B from where he
stood.  (Tr. 67-68.)

      After ESU entered the building, Detective Samaniego
credibly testified as follows.  Detective Samaniego heard loud
"booming" noises and heard his partner, Detective Giovanni
Wilson, who was "situated in front of the building, toward the
entrance" yell "gun," at which point Detective Samaniego left

his original position outside the "A" line of apartments, and ran approximately 65 feet to the front of the building. Detective Saminiego pointed out on Gov. Exhibit 4, the "front" of the 125 Nostrand Avenue building where his partner was positioned, on the north side of the building where the "B" line of apartments are depicted. (Gov. Ex. 4; Tr. 68-71.) Detective Samaniego marked Government Exhibit 4A with an "X" where he was originally stationed outside the "A" line of apartments and, upon hearing his partner yell "gun," Detective Samaniego marked with a dotted line ending with an "O" his movement from his original station to where he observed the gun coming out of the window of Apartment 3B, at the front of the building, which he marked with the letter "F." Detective Samaniego left his assigned post because he heard his partner yell "gun" and he was concerned that there wasn't sufficient cover for his partner and he felt his partner was in danger and wanted to protect him. Detective Saminiego testified, "As soon as I ran it was almost immediate I saw a hand holding a silver firearm and just letting go and the silver firearm fell down to the ground," from the third floor windows depicted in Government Exhibit 5. As soon as Detective Samaniego observed the firearm drop from the window, and saw that his partner was all right, he felt there

19

would be no further danger and he returned to his original station.  (Gov. Ex. 4A; Tr. 72-75.)  Detective Samaniego testified that the time between hearing the booming sound when ESU entered Apartment 3B and seeing the gun drop from Apartment 3B, was approximately 15-20 seconds.  (Tr. 75-76.)  Detective Samaniego explained that he did not write in his memo book the time he saw the gun come out of the window of the third floor window because he did not feel it was important, given that he later retrieved the gun and found it to be unloaded.  He did not immediately retrieve the gun because ESU was still inside Apartment 3B and his team had not been given the "all clear" so there was still a possibility that suspects and evidence were inside the apartment.  Detective Samaniego returned to his original location after observing the handgun come out of the third floor window and did not retrieve the gun because his partner was closer to that location.  (Tr. 76-77, 118.)

After returning to his original position, indicated by an "X" on Government Exhibit 4A, Detective Samaniego observed a small window on the second floor slide open and "observed a female throw a plastic bag with objects inside and some loose plastic vials with gray tops."  The window from which Detective Samaniego observed the plastic bag containing drugs being thrown

is depicted in Government Ex. 8 as the small middle window on the second floor. (Tr. 77-78.) Detective Samaniego knew that the drugs he saw being thrown from the second floor window came from Apartment 2A because he could see markings on the building with an "A" at the bottom. (Tr. 79.) Detective Samaniego testified on direct and admitted on cross examination that on January 9, 2007, he mistakenly thought that, in addition to the third floor window from which he observed the handgun being dropped, the windows of the apartment above him at his assigned location also belonged to Apartment 3B, even though he was familiar with the layout (but not the interiors) of the third floor apartments at 125 Nostrand Avenue. Detective Samaniego's mistaken belief that the windows of Apartment 3B extended from the front of the building on the north side, around to the west side above Apartment 2A where he was originally stationed, resulted in testimony before the state grand jury which he admitted was based on his mistaken belief regarding the extent of the windows of Apartment 3B. (Tr. 68, 79, 93-94, 99, 101-102, 104.) Despite Detective Samaniego's incorrect understanding that the windows of Apartment 3B extended to the location above Apartment 2A where he was assigned, and his confusion about

which side of the building was the west or east side,[4] he
admitted to his mistaken belief and confusion at the suppression
hearing.  The court finds credible Detective Samaniego's
testimony regarding his observations of the gun being dropped
from the window of Apartment 3B on the north side after he ran
from his assigned post to the northwest corner of the building,
and his subsequent observation after he returned to his original
location of a plastic bag containing drugs and gray topped vials
being thrown from the second story middle window of Apartment
2A, as depicted on Government's Exhibit 6.

Upon observing the plastic bag of drugs being thrown
from the window of Apartment 2A, Detective Samaniego notified
his supervisor, Sergeant Charleston.  As Detective Samaniego
went to retrieve the drugs, Detective Samaniego was directed not
to do so until the "all clear" was heard over the radio.  The
bag thrown from the second floor window contained seventy vials
of crack cocaine with gray tops.  (Tr. 81-82, 84-85.)  Detective
Samaniego learned that the drugs had been thrown from Apartment
2A when he retrieved the drugs and saw an "A" marked on the wall

---

[4]     The court notes that defendant's witness, Mr. Grant, was also
confused about the directions that apartment windows faced at 125 Nostrand
Avenue.

of the building and when he went upstairs and saw that NYPD officers had entered Apartment 2A.  (Tr. 109.)

ESU had previously entered Apartment 2A to look for people who might be hiding in the apartment.  Detective Samaniego assisted with searching and bringing the handcuffed occupants outside Apartment 2A down to a police van for transport to PSA-3.  Before Detective Samaniego assisted with bringing the occupants downstairs to the police van, a member of the ESU team escorted Detective Samaniego to the kitchen closet and pointed to the gun and bag of drugs on the shelf, and told him that that they were in "plain view."  However, Detective Samaniego does not know what ESU saw when ESU first entered Apartment 2A.  When Detective Samaniego returned to Apartment 2A, an ESU team member told him there was a small revolver and ziplock bag containing plastic crack vials with gray tops in the apartment.  (Tr. 82, 111-112, 123-124.)  Detective Samaniego was instructed by his sergeant to search Apartment 2A.  (Tr. 86.)

Detective Samaniego testified that the kitchen is located at the entry of Apartment 2A, to the right of the entry, and that he did not know if the kitchen closet door was opened or closed when ESU entered Apartment 2A.  In a kitchen pantry closet with an open door, on a shelf located at eye level,

Detective Samaniego saw lying next to each other the handgun and ziplock bag containing twenty-seven plastic vials of crack cocaine with gray tops that matched the vials that were thrown from the window of Apartment 2A.  After he secured those items as evidence, he continued to search the Apartment for contraband and weapons.  (Tr. 83-85, 122-123.)

Detective Samaniego did not know or see defendant Midyett before January 9, 2007 and did not search him or escort him to the police van after his arrest.  (Tr. 120.)

### D.   Detective Wilson

Detective Giovanni Wilson, who has been employed by the NYPD for eight years, testified that he was assigned to PSA-3 on January 9, 2007 and at the time he testified.  The court finds the following testimony by Detective Wilson to be credible.  At the tactical plan meeting on January 9, 2007 to discuss the execution of the search warrant for Apartment 3B, Detective Wilson was assigned to maintain security at the front of the building below the north windows of Apartment 3B, to see if any contraband or individuals exited from the windows. Detective Wilson confirmed that Government Ex. 5 accurately depicts the front of 125 Nostrand Avenue from his assigned

position. (Tr. 126-128, 141-143.)  About thirty seconds after he
heard ESU enter Apartment 3B, he saw an individual at the left
window of the third floor on Government's Ex. 5, who appeared to
be attempting to throw a silver firearm out of the window, but
who was having difficulty because of the child gates on the
windows.  Detective Wilson drew his weapon and then the gun was
dropped from the third floor window on the right side of
Government Ex. 5. (Tr. 129-130.)  During this time, Detective
Wilson testified that he would not have seen Detective Samaniego
run from his assigned location to the front of the apartment
building because Detective Wilson's "focus was on the windows,
the person pointing the gun at me."  (Tr. 147).

        Approximately 45 seconds later, Detective Wilson heard
Detective Samaniego "calling that stuff was coming out of the
window" of the second floor where Detective Samaniego was
positioned.  Thereafter, Detective Wilson went to the location
where Detective Samaniego was stationed and saw crack on the
grass below.  (Tr. 129-130.)  Although on cross examination,
Detective Wilson conceded that he may have gotten the color
wrong when he wrote in his memo book that he saw two brown bags
of crack outside the window of Apartment 2A, the court credits
Detective Wilson's testimony that he saw a gun being dropped out

of the window of Apartment 3B and that he heard Detective

Samaniego report that he saw crack being thrown from the window

of a second floor apartment, later identified to be Apartment

2A, and saw crack on the ground below the window of Apartment

2A.  (Tr. 145-46.)

Detectives Wilson and Samaniego were then called by

radio to come up to the second floor and assist with searching

individuals who had been arrested and handcuffed because the

crack that had been thrown from the window of the apartment.

Detective Wilson testified that arrested individuals are

searched to voucher and safeguard the property and recover

evidence.  Detective Wilson identified Midyett in court at the

hearing and testified that he searched Mr. Midyett and, after

refreshing his recollection after reading his paperwork from

that day (Gov. Ex. GW-4), recalled that he recovered currency

totaling $1,743 from Mr. Midyett's person.  (Tr. 131-133.)

Detective also identified Mr. Brown at the hearing and after

refreshing his recollection from 3500 GW-5, testified that he

searched him and recovered approximately $122 from Mr. Brown.

(T. 133-134.)

Detective Wilson testified that after searching the

individuals, he followed Detective Samaniego into Apartment 2A,

and that Detective Samaniego was having a conversation with ESU.
Like Detective Samaniego, Detective Wilson testified that the
kitchen is to the right of the entry (Tr. 151.) He conducted
the search of Apartment 2A with Detective Samaniego but
Detective Wilson did not discuss with ESU what had been found
before he entered the apartment. A gun and crack were recovered
from a shelf in the kitchen closet but no other additional
contraband, weapons, scales or packaging materials were found.
Detective Wilson did not search the closet himself. (Tr. 148,
154-156.)

Detective Wilson did not accompany Brown and Midyett
back to the station, but after Detective Wilson arrived at the
station, he heard Mr. Brown say that "if you let my friends go
the money and drugs are mine." (Tr. 135-136.)


### E.    Everett Grant

The defense then called Everett Grant, a private
investigator for Jay Salpeter Associates, who was retained by
defendant Brown to take photographs of 125 Nostrand Avenue in
August 2008, admitted as Brown Exhibits 1-18. Like Detective
Samaniego, Mr. Grant occasionally provided confusing testimony
about the direction or location of certain areas, like the

parking lot and windows, in relation to 125 Nostrand Avenue.
(Tr. 159-160, 162, 163-164, 165.)  Mr. Grant's credible
testimony established that if one were to face north from the
location that Detective Samaniego identified as his assigned
location, looking at the bathroom windows of Apartments 1A and
2A, one cannot see any of the windows in the "B" line of
apartments.  (Tr. 161, 166; Brown Exs. 3, 4, .)

        Mr. Grant also testified that he entered Apartment 2A
and measured the distance from the windowsill of the bathroom
window to the floor as 5'3".  (Tr. 166-167.)  In Brown Ex. 18,
Mr. Grant, who is 5'10" tall, is shown in a photograph, but
other than identifying himself below a window in the photograph
on direct examination, he did not offer any further description
of what is depicted.  Mr. Grant testified that a person who is
5'4" would not be able to see out of the window depicted in
Brown Ex. 18, except for the sky, and further testified that the
window slides open approximately seven inches.  On cross
examination, Mr. Grant clarified that in Brown Ex. 18, he is
depicted standing in the bathtub of Apartment 2A and that he did
not observe any step stools in the bathroom when he took the
photograph in August 2008 and does not know if there were any
step stools on January 9, 2007.  Mr. Grant also admitted that he

has no firsthand knowledge of the weather or lighting
conditions, or where the officers were standing or what their
perspective of Apartment 2A was on January 9, 2007 while the
search warrant was being executed.  He testified that the
kitchen is approximately three or four paces from the bathroom,
that the closet near the kitchen has sliding doors and that
during his August 2008 visit there were clothes hanging in the
closet, although he does not know what was in the closet on
January 9, 2007. (Tr. 167-171.)


## II.  DISCUSSION

### 1.  <u>Brown's suppression motion[5]</u>

### A.    The search of Brown's apartment

The Fourth Amendment to the United States Constitution
guarantees that "[t]he right of the people to be secure in their
persons, houses, papers, and effects, against unreasonable
searches and seizures, shall not be violated, and no Warrants
shall issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be

---

[5]      To the extent that Miyett joins in and adopts Brown's arguments
in support of Midyett's motion to suppress, the court's discussion and
rulings also apply to Midyett.

searched, and the persons or things to be seized."  U.S. Const.
amend IV.

The Supreme Court has long interpreted "the two
Clauses of the Fourth Amendment," the Reasonableness Clause and
the Warrant Clause, to indicate that warrantless searches —
"searches conducted outside the judicial process without prior
approval by a judge or magistrate," — are per se unreasonable
under the Fourth Amendment, unless they fall within one of a
limited number of exceptions.  Thompson v. Louisiana, 469 U.S.
17, 19-20 (1985) (quoting Katz v. United States, 389 U.S. 347,
357 (1967)).  Exceptions to the per se rule exist because "the
ultimate touchstone of the Fourth Amendment" is the
reasonableness of the search or seizure at issue.  Brigham City,
Utah v. Stuart, 547 U.S. 398, 403 (2006).  Determining whether
police action is "reasonable" under the Fourth Amendment
requires an objective analysis of the facts known to the police
at the time of the action in question.  Id. at 404.  The
subjective motivation of the officers is irrelevant in
determining the reasonableness of their actions.  Id. (citing
Bond v. United States, 529 U.S. 334, 338 n.2 (2000), Whren v.
United States, 517 U.S. 806, 813 (1996), and Graham v. Connor,
490 U.S. 386, 397 (1989)).

When police conduct a search pursuant to a warrant, the warrant must comply with all four of the requirements of the Fourth Amendment: (1) it must be based on probable cause, (2) the probable cause must be supported by sworn testimony or an affidavit, (3) the place to be searched must be described with particularity, and (4) the evidence to be seized must be particularly described. Groh v. Ramirez, 540 U.S. 551, 557 (2004).

The question before the court is whether, given the existence of the search warrant for Apartment 2A, the police acted "outside the judicial process," and therefore per se unreasonably within the meaning of the Fourth Amendment, when they searched Apartment 2A. Brown contends that the search of Apartment 2A was not conducted "pursuant to" a warrant for two reasons. The defendants first argue that, under Groh, Captain McGinn was required to have a copy of the search warrant in hand at the time the warrant was executed. Second, Brown argues that, under Groh, the search of Apartment 2A was illegal because Captain McGinn, not having read or heard all of the details of the search warrant, which was obtained by a different police

unit, did not know all of the details in the warrant and thus
could not ensure that the search complied with the warrant.[6]

In support of his position, Brown relies on the
Supreme Court's language in <u>Groh</u> that states, "[i]t is incumbent
on the officer executing a search warrant to ensure the search
is lawfully authorized and lawfully conducted" and, where the

---

[6]     Defendant Brown submitted a letter after the hearing was
concluded (Doc. 229, Letter dated January 22, 2009), challenging the
credibility of Captain McGinn's reliance on the search warrant when he
searched Brown's apartment, on the ground that Captain McGinn failed to file
a return of the search warrant, as required under NY CPL § 690.50, which he
would have been obligated to do if the search relied on the search warrant.
Although Brown's letter states that "it is uncontested" that the warrant was
not returned, there is no evidence in the record establishing whether or not
a return was filed with the issuing court.  Regardless, the court credits
Captain McGinn's testimony as to his knowledge about the search warrant and
its contents, and the court's credibility assessment would not be affected if
the facts showed that the warrant was never returned.  The court notes that
Brown has never raised CPL § 690.50 as a basis for suppression, and to the
extent that his January 22, 2009 letter intends to do so, the issue is raised
belatedly.  In any case, New York courts do not suppress evidence for failure
to comply with CPL § 690.50.  <u>See</u> <u>Town of East Hampton v. Omabuild USA No. 1,
Inc.</u>, 215 A.D.2d 746, 748 (N.Y. App. Div. 2d Dept. 1995)("noncompliance with
these ministerial requirements would not undermine the validity of the
warrant or the search"); <u>People v. Camarre</u>, 171 A.D.2d 1003, 1004 (N.Y. App.
Div. 4th Dept. 1991)("return requirement is ministerial and even relatively
lengthy delays in complying with it will not invalidate a seizure"); <u>People
v. Emerson</u>, 196 Misc.2d 716, 724-25 (N.Y. Sup. Ct. 2003).  The Second Circuit
has also held that suppression is not warranted for violations of the
analogous federal statute, Fed. R. Crim. P. 41, unless the violation resulted
in prejudice (meaning that a search was done where it might otherwise not
have been done, or that the search "would not have been so abrasive if the
Rule had been followed") or unless "there is evidence of intentional and
deliberate disregard of a provision in [Rule 41]."  <u>United States v. Burke</u>,
517 F.2d 377, 386-87 (2d Cir. 1975).  Several other circuits have also held
that minor, or "ministerial," violations of Rule 41 do not require
suppression of evidence.  <u>See</u> <u>United States v. Stockheimer</u>, 807 F.2d 610, 613
(7th Cir. 1986); <u>United States v. Harrington</u>, 504 F.2d 130, 134 (7th Cir.
1974); <u>United States v. Dudek</u>, 530 F.2d 684, 688 (6th Cir. 1976); <u>United
States v. Marx</u>, 635 F.2d 436, 441 (5th Cir. 1981); <u>United States v. Wyder</u>,
674 F.2d 224, 226 (4th Cir. 1982).  The failure of the police to properly
return the warrant in this case, therefore, would not entitle Brown to
suppression.

officer conducting the search "did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment."  540 U.S. at 563.  Brown thus asks the court to suppress the evidence recovered in Brown's apartment as the fruit of an illegal search.  Brown is mistaken as to both of his arguments.

First, contrary to Brown's argument, the Groh decision explicitly recognized that, "neither the Fourth Amendment nor rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search."  The Court further noted, "Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when . . . an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present."  540 U.S. at 562 n. 5; see also United States v. Grubbs, 547 U.S. 90, 98-99 (2006) (citing Groh, 540 U.S. at 562, n.5).  Groh, therefore, cannot be read to require an officer to have the search warrant in hand when conducting the search, as Brown contends.  Rather, the Supreme Court in Groh considered whether, in a civil action under Bivens

v. Six Unknown Fed. Agents, 403 U.S. 388 (1971), alleging

constitutional violations by a federal agent, a search conducted

pursuant to a warrant that failed to describe "the persons or

things to be seized," violated the Fourth Amendment.  The Groh

court found that the warrant was plainly invalid on its face

because it failed to describe the persons or things to be seized

and thus violated the particularity requirement of the Fourth

Amendment.  Unlike the search warrant in Groh, the warrant for

Apartment 2A was constitutionally sufficient because it

described with particularity the place to be searched (Apartment

2A of 125 Nostrand Avenue, in Brooklyn, New York) and the things

to be seized (inter alia, crack cocaine and related

paraphernalia).

Second, the court respectfully disagrees with

defendants' argument that the search of Apartment 2A violated

the constitution because Captain McGinn had not seen the search

warrant and did not know all of the particulars at the time he

ordered officers to search Apartment 2A.  The uncontested

evidence indicates that an officer from the narcotics unit told

Captain McGinn, before Captain McGinn ordered the search of

Apartment 2A, that the warrant authorized a search for crack

cocaine inside Apartment 2A.  Captain McGinn therefore had

knowledge of those particulars, and told ESU about the warrant prior to the search of Apartment 2A. Moreover, it was reasonable for Captain McGinn to rely on the warrant's compliance with the other constitutional requirements, and the warrant, in fact, did comply with those other requirements.

Captain McGinn therefore possessed sufficient information regarding the four core Fourth Amendment requirements regarding search warrants, and the warrant, in fact, actually complied with those requirements: (1) knowledge that the NYPD obtained a search warrant for Apartment 2A, upon a judicial determination of the existence of probable cause to search (Captain McGinn's credible testimony that he was told about the search warrant for Apartment 2A of 125 Nostrand Avenue: Tr. 13-15, 25-26, 28, 49-50, 53; Gov. Ex. 1: Search warrant signed by New York Criminal Court Judge Anthony J. Ferrara on January 3, 2007, upon "proof by affidavit" of Police Officer Kevin Rogers); (2) supported by an affidavit or sworn testimony (Gov. Ex. 2: Affidavit In Support of Search Warrant by Police Officer Kevin Rogers); (3) a particularized description of the place to be searched (Captain McGinn's credible testimony that he knew the search warrant was for Apartment 2A of 125 Nostrand Avenue:  Tr. 15, 28, 53; Gov. Ex. 1: warrant describing

the place to be searched as 125 Nostrand Avenue, Apartment 2A, on the second floor, Kings County, New York); and (4) a particularized description of the things to be seized (Captain McGinn's credible testimony that he knew the search warrant for Apartment 2A was for crack cocaine: Tr. 15, 28, 53; Gov. Ex. 1: warrant describes items to be seized as including, <u>inter alia</u>, crack cocaine).  Consequently, Captain McGinn had sufficient information to direct a search within constitutional parameters.

The Supreme Court has stated that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient," and an officer therefore may reasonably rely on the validity of the warrant.  <u>United States v. Leon</u>, 468 U.S. 897, 920-21 (1984) (creating a "good faith" exception to the exclusionary rule for evidence the police seize in reasonable reliance that a search warrant issued by a neutral magistrate is valid); <u>see also</u> <u>Whiteley v. Warden</u>, 401 U.S. 560, 568 (1971) (stating, in the arrest warrant context, that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of

probable cause"). An officer may rely on information from another officer that a search warrant has issued in order to begin executing that warrant by detaining an occupant of the location without having seen the warrant. See United States v. Ritchie, 35 F.3d 1477, 1483 (10th Cir. 1994).

Analyzing the objective information known to Captain McGinn at the time that he ordered the entry and search of Apartment 2A, as required by Stuart, 547 U.S. at 404, Captain McGinn had been informed by a narcotics officer that a search warrant was issued, and thus, pursuant to Whitely and Ritchie, supra, he behaved reasonably in relying on the search warrant having been properly issued by a neutral judicial officer upon sworn testimony that established probable cause. And, indeed, defendants have not challenged the probable cause for this search warrant, or its facial sufficiency. Captain McGinn had also been informed of the two remaining constitutional requirements for a search warrant: information about the particular place to be searched, Apartment 2A at 125 Nostrand Avenue in Brooklyn, and the particular item to be seized, crack cocaine. See Groh, 540 U.S. at 557.

Beyond merely complying with the four core warrant requirements of the Fourth Amendment, the undisputed credible

facts establish that the execution of the warrant substantially complied with the procedural restrictions contained in the body of the warrant itself: the warrant was executed in the daytime, within ten days of its issuance, by officers of the NYPD. Although the warrant authorized the officers to enter Apartment 2A without previously announcing their authority (a "no-knock" warrant), Captain McGinn was unaware of this term. He adopted the more conservative approach to gaining entry to Apartment 2A by directing ESU officers to knock at the door and announce the NYPD's presence. This decision underscores the reasonableness of Captain McGinn's conduct in a situation in which he knew of the search warrant for crack cocaine inside Apartment 2A, but did not actually possess the warrant and thus did not know whether a no-knock entry was permitted.

Applying an objective standard in determining whether Captain McGinn's search of Apartment 2A was "pursuant to" the warrant, the court finds that because the warrant authorized the search of Apartment 2A by "any police officer in the City of New York" (Gov. Ex. 1), it is of no moment that the PSA-3 team did not obtain the search warrant for Apartment 2A, or that they did not intend to execute that warrant when they went to 125 Nostrand Avenue on January 9, 2007. Captain McGinn's knowledge

of the contents of the search warrant and his reasonable reliance that the warrant was facially valid were sufficient.

Based upon the foregoing undisputed facts, Captain McGinn did not violate the Fourth Amendment when he directed the NYPD ESU and PSA-3 officers to enter Apartment 2A and search inside for crack cocaine, because the search of Brown's apartment was conducted "pursuant to" a valid search warrant.[7] Accordingly, the court denies Brown's motion to suppress the evidence recovered inside his apartment as a result of the search.[8]

---

[7]     Because the court finds that the search of Apartment 2A was conducted pursuant to the search warrant, the court need not address the government's alternative argument that exigent circumstances justified the entry of Apartment 2A and a security search of the premises, including closets in which a person could hide.  Nonetheless, the court finds that Captain McGinn's undisputed credible testimony established that he was informed at the scene that drugs were being thrown from the window of Apartment 2A.  The Second Circuit has held that exigent circumstances arise when police become aware of the destruction or disposal of narcotics, and that the police may then enter a dwelling without waiting for a warrant and conduct a security search to locate any people within the premises.  See, e.g., United States v. Lopez, 937 F.2d 716, 722-23 (2d Cir. 1991).  Exigent circumstances thus existed and justified the entry of Apartment 2A and a search of all places where a person might be located, including the closet near the kitchen.

[8]     Although Brown did not move to suppress the crack cocaine that was thrown from the bathroom window of Apartment 2A, the court notes that a defendant does not have a legitimate expectation of privacy in a package of cocaine that is thrown outside when police approach the apartment.  United States v. Arboleda, 633 F.2d 985, 991 (2d Cir. 1980) (citing Rakas v. Illinois, 439 U.S. 128 (1978)).

**B.   Brown's statements**

Brown contends that his statements, as well as items recovered on his person (two cellular telephones and $122.35 in cash), were seized pursuant to an illegal search of his apartment and his subsequent arrest, and should be suppressed as "fruits of the poisonous tree."  Physical evidence and statements obtained as an unattenuated result of an illegal search and arrest are subject to the exclusionary rule and cannot be used as evidence against the victim of the illegal search.  Brown v. Illinois, 422 U.S. 590, 597-605 (1975) (discussing Wong Sun v. United States, 371 U.S. 471 (1963)).

The court, however, has determined that the search of Brown's apartment was valid.  The court further finds that unrefuted evidence in the record establishes that a gun and crack cocaine were found in plain view inside Brown's apartment.[9] The court denies Brown's motion to suppress evidence recovered as a result of his arrest.  Brown has not argued that the police had no probable cause to arrest him, but only that the evidence giving them probable cause was discovered as a result of an

---

[9]    The cross examination of Samaniego established that an ESU officer told Samaniego that a gun and drugs were in plain view to the ESU officers when they searched the apartment.  Tr. 111-113.  For the purposes of the defendants' suppression motions, the court credits this testimony that drugs and a gun were in plain view inside the apartment when ESU entered and searched the premises.

40

illegal search.[10]  The court has rejected Brown's contention that the search was illegal.  Because Brown's statements are the fruit of a valid arrest subsequent to a constitutional search, Brown and Wong Sun do not apply.  There is no poisonous tree, and Brown is therefore not entitled to suppression of his statements.

## 2.   Midyett's suppression motion as to January 9, 2007

### A.   The search of Brown's apartment

A search may only be challenged under the Fourth Amendment by one who has a reasonable expectation of privacy in the place searched or the item seized.  Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Rakas v. Illinois, 439 U.S. 128 (1978)).  An individual who is a mere guest in an apartment and does not demonstrate a "degree of acceptance into the household" equal to that of an overnight guest does not have a reasonable expectation of privacy sufficient to make a Fourth Amendment challenge to an entry into the premises.  Carter, 525 U.S. at 90; United States v. Cody, 434 F. Supp. 2d 157, 165-67 (S.D.N.Y. 2006) (applying Carter and finding no reasonable expectation of

---

[10]    Nowhere in Brown's motion papers did Brown claim that he was arrested without probable cause, and he did not argue so at the hearing.  At the very end of oral argument, at the conclusion of the hearing, counsel for Brown described, in passing, Brown's arrest as "unlawful."  Tr. 362:5-7. Counsel did not ascribe that unlawfulness to a lack of probable cause.

privacy in a hotel room that the defendant visited several times and in which he allegedly engaged in an extramarital affair, but in which he never stayed overnight.)

Midyett's affidavit establishes only that he was an invited guest in Brown's home and engaged in a social visit there. Midyett relies on United States v. Fields, 113 F.3d 313 (2d Cir. 1997) for the proposition that a mere invited guest can reasonably expect privacy in the premises they visit. The Second Circuit decided Fields before the Supreme Court, in Carter, as discussed above, held that an invited guest who did not stay overnight had no reasonable expectation of privacy in the visited premises. Although the Second Circuit has not had occasion to revisit the holding of Fields since Carter was decided, this court follows the approach of the court in Cody and holds that, under Carter, Midyett had no protected privacy interest in Brown's apartment. Midyett therefore cannot challenge the search of Apartment 2A, and the court consequently denies his motion to suppress the evidence recovered there.

### B.    **The search of Midyett's pockets**

Midyett also seeks to suppress approximately $1,700 in cash found in his pockets when he was arrested in Apartment 2A

on January 9, 2007.  Midyett's expectation of privacy in his own

pockets is reasonable and obvious.  <u>See</u> U.S. Const. amend. IV

(protecting the "right of the people to be secure in their

<u>persons</u>)(emphasis added); <u>Terry v. Ohio</u>, 392 U.S. 1, 8-9 (1968)

(holding that the Fourth Amendment "right to personal security"

applies to a search of an individual's clothing and effects on a

public street.)  Nonetheless, the court denies Midyett's motion

to suppress evidence discovered in his pockets following his

arrest for the same reasons it rejected Brown's motion, namely,

the search of Apartment 2A was conducted pursuant to a valid

search warrant and was therefore not illegal.  The $1,700 in

cash found in Midyett's pocket was discovered in a search

incident to arrest, and, like Brown, Midyett has not argued that

the police had no probable cause to arrest him,[11] but rather that

his arrest was based upon an illegal entry and search of

Apartment 2A.  The Supreme Court has long held that "a search

incident to a lawful arrest is a traditional exception to the

warrant requirement of the Fourth Amendment."  <u>United States v.</u>

---

[11]    At the hearing, counsel for Midyett twice made passing reference
in his concluding argument to there being "no probable cause" to arrest
Midyett.  Tr. 362:13-14; 369:20-22.  The issue is not, however, before the
court because Midyett did not challenge the probable cause for his arrest
anywhere in his motion papers, and the passing comments in his argument did
not raise the issue in any cognizable manner.

Robinson, 414 U.S. 218, 224 (1973).  Therefore, the court denies Midyett's motion to suppress the money found on his person.


### 3.  Midyett's suppression motion as to December 10, 2007

The court defers ruling on Midyett's suppression motion as to his December 10, 2007 arrest at this time.  The court will rule on that motion in writing at a later date.


**SO ORDERED.**

Dated:     February 3, 2009
           Brooklyn, New York


                          _____/s/_____
                          KIYO A. MATSUMOTO
                          United States District Judge